2022 UT App 38

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KEVIN SALAZAR,
Appellant.

Opinion
No. 20200561-CA
Filed March 31, 2022

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 151910846

Troy L. Booher, Beth E. Kennedy, and Pal A.
Lengyel-Leahu, Attorneys for Appellant

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ORME, Judge:

¶1    Kevin Salazar challenges his conviction for aggravated sexual assault. Salazar primarily contends that his trial counsel provided ineffective assistance, warranting a new trial. We agree and reverse.

BACKGROUND[1]

*The Assault*

¶2    One evening in October 2012, Salazar went to a hookah lounge he often frequented. Also at the lounge that night were the owner of the lounge (Owner), Shannon,[2] Shannon's friend (Friend), and Shannon's coworker (Coworker). Shannon considered both Salazar and Owner to be her friends.

¶3    After smoking in the lounge for a time, Salazar, who looked to Shannon like he had been crying, asked to speak to Shannon in a storage closet in the hallway that connected the lounge to the front of the shop. After they entered the closet, Salazar closed the door and began kissing Shannon's neck. Shannon told him to stop, stating that she "ha[d] a boyfriend." This did not deter Salazar, and soon Owner knocked on the closet door and entered the closet. Shannon thought Owner was going to help her, but instead Owner "bent [her] over," "pulled [her] pants down," and began having "vaginal sex with [her]." While this was occurring, Salazar removed his pants and inserted his penis into Shannon's mouth. Shannon did not "agree[] to what was going on."

¶4    Shannon next recalled "being on the floor and [Salazar] was underneath [her] and [Owner] was behind her." At this point "[Salazar] was having sex vaginally" with Shannon while Owner was penetrating her anally. The men then high-fived each other, and Salazar said, "Double penetration." While this

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. A pseudonym.

was occurring, Shannon "heard [Friend] on the other side of the door and . . . started crying."

¶5     Friend heard Shannon say, "Help me," and Friend began banging on the door and trying to open it, but she was unsuccessful because it was locked. At this point, as Shannon continued crying, the men stopped. Shannon then pulled her pants back on and ran out of the closet. Friend noticed that Shannon "was really distraught," crying, and "could barely breathe when she was talking." Shannon and Friend then left the lounge. While leaving, Shannon ran into Coworker, who described her as "barely able to form sentences because she was crying so hard." She was "hysterical, sobbing, telling us, 'I have to go. I have to go. I have to get out of here.'" She then told Coworker, "We have to go. I was raped. These two guys took me into a closet and raped me."

¶6     While in the car heading home, Shannon told Friend what happened in the closet. When Shannon got home, she called an old friend (Friend 2) and, while crying, told him that Salazar and Owner "had raped [her]." Shannon did not call the police "[b]ecause [her] dad was dying of cancer and [she] didn't want to stress him out." But Friend 2 did call the police, and a detective then called Shannon. He noticed that her "speech pattern was broken . . . [l]ike, she had been sad or crying or upset." The detective then met with Shannon at her home. While telling the detective about the assault, "she was sad," she "wouldn't look [the detective] in the eye," and her body was "slumped." Shannon also told the detective that at some point before the assault, a man had given her a soda and that she felt "weird" after drinking it. The detective convinced Shannon to go to the hospital for a sexual assault examination.

¶7     At the hospital, the nurse conducting the exam discovered injuries to Shannon's genitals and anus and later testified that Shannon's rectal injuries "stuck out" to her because they were the "worst" she had "seen on a patient" and so she was able to

remember them years later when testifying. But the nurse also indicated that although severe, the injuries could be consistent with consensual sex. Shannon also told the nurse about the soda.

¶8     Because Shannon did not want to further stress her father, she did not "want to go forward with the prosecution of the case." The case sat idle until 2015—a year after Shannon's father had passed away—when a member of the production team of a television show that investigated unsolved sex crimes contacted Shannon. He told Shannon that "they pulled [her] case and wanted to go through the story of what happened and wanted to . . . help [her] get through with getting charges pressed." Shannon agreed to participate in the show and personally appeared on the program. At some point during 2015,[3] police interviewed Shannon, and after her interview, police interviewed Salazar in July 2015.

¶9     During his interview, Salazar gave his version of events in which Shannon "pulled my arm and we went into the [closet]" where she "pull[ed] down my pants" and "suck[ed] my penis." Shannon then opened the door when Owner knocked on it and pulled him in and "started jumping on him, making out [and] pulling down his pants." At this point, she began sucking Salazar's penis again while Owner penetrated her from behind. According to Salazar, Shannon then said she wanted him so they "switched." Shannon then said she "wanted" Owner and "they switched again," this time with Shannon on top of Owner while again giving Salazar oral sex. Salazar stated that at this point, Shannon "started to cry." He asked if she was "okay," but "she was just crying and crying and crying" and then left the closet.

---

3. It is not clear from the record if Shannon contacted the police or if the police contacted Shannon about reopening the case in response to the television show. It is also unclear whether Shannon's and Salazar's police interviews were conducted before or after the show aired on television.

¶10 Salazar recounted that Shannon called him a few days later and apologized for involving the police. She said her friends threw her "under the bus" but that she and Salazar "were cool again," and they continued to be friends and hung out multiple times. One of the interviewing officers stated that "it sounds like she was pretty excited, like she wanted to have sex," and Salazar responded, "That's what it seemed like, but sitting here I don't think so." An officer later asked, "Any chance you could have misinterpreted what [Shannon] may have wanted?" Salazar answered, "I doubt it. Due to the fact that she was the one pulling [our] pants down." The officer then asked whether he could have misinterpreted her pulling Owner into the closet, suggesting she may have done that "to help her get out of the situation she was in with you." Salazar responded, "I don't know." The officers again asked what happened, and Salazar stated that "as far as I can remember," Owner held "her down for a bit" before she left. The officers stated that, from their perspective, it seemed that Shannon did not want to be in the closet. They asked Salazar whether he knew she did not want to be in there, to which Salazar responded, "At the time probably not, but probably at the time, probably." The officers did not ask him to clarify this confusing response. Salazar also denied high-fiving Owner or saying anything to Owner, stating that they instead were "just looking at each other." The officers continued to press Salazar, stating, "You know for a fact she didn't want to be there; right?" Salazar responded, "Honestly, at the time probably not."[4] The officers then asked whether Shannon running away "look[ed] like a girl that just want[ed] to have sex with the guys?" Salazar responded, "Now that it's

---

4. Standing alone, it is unclear whether Salazar meant that, at the time, Shannon probably did not want to be there or whether he meant that, at the time, he did not realize that she did not want to be there. His subsequent answer suggests he likely meant the latter.

more clear, probably not" but at the time it seemed like "she wanted to have sex."

*Preliminary Hearing and Trial*

¶11 Nearly seven years after the incident, and four years after the interviews, the State charged Salazar and Owner with aggravated sexual assault in August 2019.[5] They were tried together. Salazar retained counsel (Trial Counsel) to represent him. Owner had his own counsel.

¶12 At the preliminary hearing, Shannon testified about the assault and her later contact with Salazar. She stated that she received "a few messages" from Salazar in the days immediately after the incident, but she "block[ed] him after that and . . . reported it to the police." She also testified that she did not "hang out with him after [the assault]" and "never had any direct contact with Mr. Salazar." She further testified that, following the assault, she never texted, called, or left Salazar any voicemails. Shannon also testified that she remembered being given a soda at some point before the assault by an unidentified male but stated that she did not remember whether she told the detective she "felt funny or strange after drinking [it]." She then stated that she did not "feel that [the soda] affected [her] in any way." Salazar and Owner were bound over on the charged counts, and the case then proceeded to trial.

¶13 At trial, the State called Shannon, Friend, Friend 2, Coworker, the nurse, and the detective to testify. Except for Shannon, their testimony was consistent with the facts laid out previously.

---

5. It is unclear from the record why it took nearly four years from the time police interviewed Shannon and Salazar for charges to be filed.

¶14 During her testimony, Shannon had significant trouble remembering specifics, even stating at one point that she did not "remember where it happened." She could not remember whether she or the defendants said anything after Owner entered the closet. She could not remember how they ended up on the floor. Overall, in response to questions regarding specifics of the incident, she stated more than 40 times that she could not remember. To help refresh her recollection, the prosecutor gave her copies of her police interview, the nurse's sexual assault exam, and the preliminary hearing transcript. After reading these documents, many of which included highlights or sticky notes, she stated that her memory was refreshed, but the trial court had to caution her at one point to put the documents down when thereafter responding to questions. Throughout her testimony, she had to rely on those documents to remember what occurred, and she admitted that she had reviewed the documents before trial and would not have been "able to relate the details that are in [the documents] without having read [them] again."

¶15 On cross-examination, the following exchange took place:

> [Trial Counsel]: [T]he things that you've said are that you couldn't remember anything after [Salazar] was in the closet with you up until the very end; is that right?
>
> [Shannon]: Correct.
>
> [Trial Counsel]: So that's the truth; right? Those are the things that you can't remember; right?
>
> [Shannon]: Correct.
>
> [Trial Counsel]: Okay. The things you can remember are simply this: That you were in a closet with [Salazar] and that sometime later you

can recall being on the floor with him and someone else; right?

[Shannon]: Him and [Owner], yes.

[Trial Counsel]: And you have no recollection, even after you read that thing, which was before today, you had no recollection of any of the things that were in that document, right?

[Shannon]: Can you rephrase the question?

[Trial Counsel]: Sure. You looked at the interview that was typed up on July 31 . . . and you read it at your leisure, you saw all the things that you said back then; right?

[Shannon]: Right.

[Trial Counsel]: But when you came in here today and you took an oath to testify in front of these people, you already could not remember any of that until you were shown it again right in front of the jury, right?

[Shannon]: Correct.

¶16 Additionally, Shannon stated that she did not remember telling the detective or the nurse that she felt strange after drinking the soda. But when presented with the detective's and the nurse's reports, Shannon did not "contest" that she told them she felt strange after drinking the soda. And when presented with a transcript of the preliminary hearing, she agreed that she testified that she "felt fine" after drinking the soda.

¶17 Despite her troubles remembering the details of the incident, Shannon did testify that she "always remembered the

end of what happened to [her] in the storage room," with Friend at the door while Owner "had his penis in my rectum and [Salazar] was vaginally."

¶18    Regarding her interactions with Salazar after the assault, Shannon stated that she did not recall having contact or socializing with Salazar after the incident but that she "was told that I reported something before to the cops, but I don't remember." Shannon also stated that it was "correct" that "at the preliminary hearing under oath [she] said that [she] would never have had contact with [Salazar] after the fact" and that if she inadvertently ran into him, "it probably wouldn't have been a big deal" because she was "just trying to put it all behind [her]."

¶19    At the close of the State's case, Trial Counsel moved for a directed verdict on the ground that because Shannon had no independent memory of the events, there was insufficient evidence from which the jury could conclude beyond a reasonable doubt that a crime had been committed. The court denied the motion.

¶20    On the advice of Trial Counsel, Salazar did not testify in his defense. Trial Counsel explained that he advised Salazar not to testify because he believed it to be "in his best interest" due to "some uncounseled statements he gave during an interview to the police department." Owner also did not testify but called his brother and a friend, who both testified that Shannon did not appear to be crying or upset when she left the lounge on the evening in question. The jury convicted both defendants of aggravated sexual assault.

*Post-trial Motion*

¶21    Through new counsel, Salazar moved for a new trial on four grounds relevant to his appeal. First, he asserted that Trial Counsel was ineffective for advising Salazar not to testify because he was the only one who could have contradicted

Shannon's testimony. Second, he contended that Trial Counsel was ineffective for failing to call two witnesses, Junior and Tim, who Salazar informed Trial Counsel would have testified that Shannon "acted comfortable—even flirtatious—around [him], only a few months after [Shannon] said [Salazar] raped her." Specifically, Junior and Tim would have testified about an evening where Shannon came over to Junior's house with Salazar. That evening, they smoked hookah and played video games, and at the end of the night, Shannon fell asleep on Junior's king-size bed with both Salazar and Junior. Junior also would have testified that he witnessed Salazar socialize with Shannon on two other occasions. Salazar explained that this testimony would have "undermined [Shannon's] account of what happened inside the closet" because Junior and Tim "saw how [Shannon] later acted around [Salazar], and a reasonable jury could have concluded that her actions were inconsistent with someone who had been raped by [Salazar]." Third, he argued that, although many more text messages between him and Shannon were lost when he got a new phone, there were still messages between the two on an app called Voxer.[6] These messages were readily available on an iPod he gave Trial Counsel, and the messages were at odds with Shannon's denials of subsequent contact with Salazar. New counsel argued that Trial Counsel was ineffective for not obtaining and using those messages to "undermine" Shannon's testimony. Finally, he asserted that Shannon's testimony was inadmissible because, at the end of her testimony, she admitted she had no independent memory of the assault and had "testifie[d] from documents beyond what she actually remember[ed]."

---

6. Voxer is an app that allows users to exchange "voice, text, photo, and video messages." *About Us*, *Voxer*, voxer.com/about [https://perma.cc/7ALW-BPFN]. Its primary service is to "deliver[] voice live—so it can be listened to immediately" while also "simultaneously record[ing] the message—so it can be listened to later." *Id.*

¶22 In support of his motion, Salazar submitted a number of affidavits, including one from his sister in which she averred that she had logged into Salazar's Voxer account and was able to access numerous voice messages, along with a single text message,[7] which Shannon sent to Salazar in the months following the incident. As part of her affidavit, Salazar's sister provided screen shots from the app showing that Shannon sent twenty voice messages[8] and one text message to Salazar in January 2013.[9] For his part, Salazar sent Shannon sixteen messages. Apparently not all the voice messages were accessible when Salazar's sister tried to open them, but she was able to provide a partial transcription as follows:[10]

---

7. This text message was in addition to an initial message that was generated by the Voxer app, letting Salazar know that Shannon was now using Voxer.

8. Salazar's sister's transcription of the messages indicates that Shannon sent nineteen voice messages. But after reviewing the screen shots of the messages, it is clear that Shannon sent twenty voice messages, one of which was omitted from the transcription.

9. All that can be seen from these screen shots is a message exchange between Shannon and Salazar, with indications when the voice messages were sent along with the length of each message. The exchange begins with a voice message from Shannon and includes a text message in which Shannon complains of neck pain in response to an audio message from Salazar in which he inquired about how she was fairing following an auto accident. Shannon's twenty audio messages ranged in length from one second to fifty-nine seconds.

10. Aside from altering names with bracketed substitutes, we have reproduced the transcription exactly as it is found in the

(continued…)

1/23/13 (0.9) [Shannon]: [Sounds only – no speaking]

1/24/13 (0:01) [Salazar]: *Message uploaded partially*

1/24/13 (0:02) [Shannon]: "I've been good, how are you? Come to Babylon tonight."

1/24/13 (0:06) [Salazar]: *Message uploaded partially*

1/24/13 (0:08) [Shannon]: "Well we're going to the warehouse party first and that starts at nine, and we'll only go for like an hour so I'll probably be at the Babylon around ten, ten-thirty."

1/24/13 (0:12) [Shannon]: "Yeah you should for sure try to come and I'm good, I'm just donating plasma right now but umm . . . my dad, we just found out he has brain cancer too so yeah, it's been kind of rough."

1/24/13 (0:16) [Salazar]: *Message uploaded partially*

1/24/13 (0:25) [Shannon]: "Yeah pretty much, I'm donating bone marrow then maybe in the next like two weeks or so—you get like a thousand bucks for that. But um, Babylon, [John] is going, I think you know him. [John] or whatever, he's my boy and then me, um, [Shelly], and [Brent] and I don't know there's lots of people."

---

(…continued)
record, and all the other alterations are from Salazar's sister's original transcription.

1/24/13 (0:04) [Shannon]: *Message uploaded partially*

1/24/13 (0:05) [Salazar]: *Message uploaded partially*

1/24/13 (0:11) [Shannon]: *Message uploaded partially*

1/24/13 (0:10) [Salazar]: *Message uploaded partially*

1/24/13 (0:10) [Salazar]: "Yeah you do. Uh—yeah so how's school? How's uh—what, what are you gonna do? Like, are you gonna like, go back to school? Or what? What are your plans?"

1/24/13 (0:02) [Shannon]: "I'm actually joining the Airforce."

1/24/13 (0:10) [Salazar]: *Message uploaded partially*

1/24/13 (0:29) [Shannon]: *Message uploaded partially*

1/24/13 (0:13) [Salazar]: "Man that sounds crazy. Um—well that's good, you're gonna be getting a lot of dick so I mean that good for you cause I know you like to fuck a lot but, that's good. Uh—but about the car accident; that sucks to be you guys but are you guys alright?"

1/24/13 [Shannon] (typed): "No . . . Ugh my neck fuckin kills"

1/24/13 (0:05) [Salazar]: *Message uploaded partially*

1/24/13 (0:03) [Shannon]: *Message uploaded partially*

1/24/13 (0:02) [Salazar]: *Message uploaded partially*

1/26/13 (0:03) [Shannon]: *Message uploaded partially*

1/26/13 (0:16) [Salazar]: *Message uploaded partially*

1/28/13 (0:01) [Shannon]: *Message uploaded partially*

1/28/13 (0:01) [Salazar]: *Message uploaded partially*

1/28/13 (0.6) [Shannon]: "Why not?"

1/29/13 (0:01) [Salazar]: "What are you doing?"

1/29/13 (0:02) [Shannon]: *Message uploaded partially*

1/29/13 (0:01) [Shannon]: *Message uploaded partially*

1/29/13 (0:59) [Shannon]: [background noise—speaking with someone else]

1/29/13 (0:01) [Salazar]: *Message uploaded partially*

1/29/13 (0:10) [Salazar]: *Message uploaded partially*

1/29/13 (0:01) [Shannon]: *Message uploaded partially*

1/29/13 (0:15) [Salazar]: *Message uploaded partially*

1/29/13 (0:02) [Shannon]: "I almost got in a fistfight in Babylon today."

1/30/13 (0:03) [Salazar]: "[Shannon] what are you doing? We should chill right now. You down?"

1/31/13 (0.6) [Shannon]: *Message uploaded partially*

¶23　Salazar averred that he told Trial Counsel that he "still had access to some of the messages [Shannon] and I sent each other in early 2013" located "on an app called Voxer." He stated that he gave Trial Counsel "an iPod with the Voxer app installed on it," along with the login information and "asked him to review the messages to and from [Shannon] and to use them at trial."

¶24　In response to Salazar's motion, the State contended that Trial Counsel's advice to Salazar not to testify was objectively reasonable due to Salazar's inculpatory statements made during his police interview. The State also argued that neither Junior nor Tim were present at the lounge the night of the assault, and therefore their testimony regarding the later purported "interactions" between Salazar and Shannon would "not address the issue of consent." The State explained that Salazar wanted the

> court to buy into the idea that a "victim" should respond to their rapist in some standardized manner, but research shows this simply is not true. How an individual reacts or interacts with others is complex. In fact, there was discussion between the parties about the potential of the State calling a "Rape Myth" expert which did not occur based upon many factors. Ultimately, [Trial Counsel] made the decision not to pursue this theory of the case and no expert was "noticed."

Given the prospect that an expert would have been called to undermine the significance of the post-rape interaction, the State argued it was "a perfectly reasonable trial strategy not to attack a 'Victim' for their post assaultive behavior."

¶25　Regarding the Voxer messages, the State argued that "there is nothing in the record to indicate that" Trial Counsel "had it or even knew about it" or that he "was aware of these

conversations." The prosecutor explained that before trial, Trial Counsel had turned over Salazar's "phone"[11] and passwords, and "no messages were located" by investigators. The State further asserted that even if Trial Counsel did have the messages, there was "no way to authenticate [Shannon's] voice to show that these messages even came from her." At oral argument on the matter, the prosecutor argued that "this is newly discoverable evidence." The prosecutor claimed that Trial Counsel came to him and "said there's messages on this phone," and the prosecutor responded that "instead of you paying for it, let the State do it. . . . And he gave me the phone, so we . . . could save, quite frankly, Mr. Salazar some money. And we did the download on the phone" but did not find the messages. The prosecutor explained that if Trial Counsel did have the messages, a reasonable explanation for Trial Counsel not using the messages was that "he knew that [the prosecutor] would have called the counter-intuitive expert. He knew that. We'd had . . . conversations on that."

¶26 Finally, the State argued that Shannon's testimony was admissible because her "memory was properly refreshed under Utah Rule of Evidence 612 which permits a witness's recollection to be refreshed by a writing." The State contended that "[m]ost of [Shannon's] testimony was from memory without necessity for refreshment" and "[t]he testimony that was made after refreshing her recollection was properly admitted."

¶27 The court denied Salazar's motion. It ruled that Trial Counsel's advice to Salazar not to testify was reasonable because during Salazar's interview with police, he "agreed with detectives on three different occasions that [Shannon] probably did not want to have sex." It explained that "[t]hese are highly

---

11. There is no indication in the record that both a phone and an iPod are in play. The prosecutor apparently misspoke in referring to a "phone."

impugning statements, and it was reasonable for trial counsel to prevent the jury from hearing them."

¶28 The court then ruled that Trial Counsel did not perform deficiently by not calling Junior and Tim to testify. It determined that "it was reasonable for defense counsel to weigh the danger that the jury may consider the testimonies of [Junior and Tim as] 'victim-blaming'" that would have hurt Salazar's case, especially "in the milieu of contemporary American Politics, where the '#MeToo' and other movements have brought awareness and initiated discussion of counterintuitive post-assaultive behavior."

¶29 Regarding the Voxer messages, the court noted that there was disagreement on whether this was newly discovered evidence or whether it was evidence that might support an ineffective assistance of counsel claim. The court noted that it was "doubtful this is newly-discovered evidence as the Voxer messages could have been discovered and produced at trial in the exercise of reasonable diligence." And at oral argument on the matter, the court stated, "There's evidence before me that [Trial Counsel] had them and elected not to use them." But it determined that regardless of whether it was newly discovered evidence or constituted an ineffective assistance of counsel claim, Salazar's claim was unavailing because he could not show prejudice. The court noted that the Voxer messages showed that Shannon and Salazar had contact after the assault and that Shannon invited Salazar to Babylon, a hookah lounge, and talked about Shannon's future plans and her father's illness. The court then ruled that although Shannon testified at the preliminary hearing that she had no contact with Salazar after the assault,

> she also testified at the preliminary hearing and at
> trial that she had forgotten she exchanged
> messages with [Salazar] and reported the messages
> to the police. . . . Thus, presenting the Voxer

messages to the jury would have confirmed [Shannon's] testimony as much as it would have impeached it.[12]

> Furthermore, even if the jury found [that Shannon] lied during the preliminary hearing based on the Voxer messages, the jury could still [have] found her credible about the sexual assault. [Shannon's] testimony was corroborated by [Friend's] testimony and was consistent with statements she made to [the nurse] and [Coworker].

¶30 Finally, the court rejected Salazar's claim that Shannon's testimony was inadmissible in its entirety because it was "convinced" by Shannon's "demeanor and her ability to acknowledge when her testimony was not refreshed that her testimony was reliable enough to be admissible." The court then denied Salazar's new trial motion. Salazar appeals this denial.

## ISSUES AND STANDARDS OF REVIEW

¶31 Salazar claims that the trial court erred in denying his motion for a new trial on the ground that Trial Counsel provided constitutionally ineffective assistance for failing to investigate or

---

12. This characterization overlooks that Shannon testified that she and Salazar exchanged texts only within a few days of the incident, whereupon she blocked him and so advised the police. Thus, evidence that she had exchanged voice and text messages with Salazar some three months after the incident would not have confirmed her testimony in this regard. If credited by the jury, it would have refuted her testimony.

use the Voxer messages.[13] Generally, we review a trial court's ruling on a motion for a new trial for an abuse of discretion. *State v. J.A.L.*, 2011 UT 27, ¶ 20, 262 P.3d 1. "But when a defendant moves for a new trial on ineffective assistance of counsel grounds, we apply the standard of review set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 26, 493 P.3d 711, *cert. granted*, 502 P.3d 268 (Utah 2021). That standard presents a mixed question of fact and law. *Strickland*, 466 U.S. at 698. We thus "review a trial court's

---

13. Salazar also contends that Trial Counsel was ineffective in two additional respects. First, he asserts that Trial Counsel was ineffective for advising him not to testify. Given our reversal, it is unnecessary to definitively weigh in on this. But we do view this decision as "a quintessential question of judgment and strategy." *See State v. Fleming*, 2019 UT App 181, ¶ 12, 454 P.3d 862. And here, even though Salazar did at times state during his interview that Shannon initiated the sexual contact, he also offered statements that could have been damaging to his case. For example, when asked if it seemed like Shannon wanted to have sex at the time, Salazar responded, "That's what it seemed like, but sitting here I don't think so." Considering that the interview contained both potentially beneficial and potentially harmful statements, it is doubtful we would conclude that Trial Counsel acted unreasonably in advising Salazar not to testify. *See State v. Franco*, 2012 UT App 200, ¶ 10, 283 P.3d 1004 ("A decision by counsel that reasonably weighs the risks and benefits of available strategic approaches before choosing one as preferable to others cannot support a claim that counsel was deficient in either strategy or performance, even if the approach did not lead to the desired result.").

Second, Salazar asserts that Trial Counsel was ineffective for not calling Junior and Tim to testify in an effort to undermine Shannon's credibility. But due to our reversal on Trial Counsel's failure to introduce the Voxer messages to undermine Shannon's credibility, we have no need to address this claim either.

application of the law to the facts for correctness and, if applicable, we review the court's findings of fact for clear error." *Torres-Orellana*, 2021 UT App 74, ¶ 26.[14]

¶32 Salazar also argues that the trial court "erred when it allowed the jury to consider Shannon's testimony even though she admitted that she had no independent memory of the events." It is not entirely clear, however, whether Salazar is appealing from the trial court's denial of his directed verdict motion or from the court's denial of his motion for a new trial, both of which raised the same claim. And the directed verdict motion implicates a different remedy. *See State v. Emmett*, 839 P.2d 781, 784 (Utah 1992) ("When a motion for a directed verdict is made at the close of the State's case, *the trial court should dismiss the charge* if the State did not establish a prima facie case against the defendant by producing believable evidence of all the

---

14. The concurring opinion in *State v. Torres-Orellana*, 2021 UT App 74, 493 P.3d 711, *cert. granted*, 502 P.3d 268 (Utah 2021), noted that this standard of review is problematic. Specifically, the concurrence suggested that when reviewing a trial court's ruling on an ineffective assistance of counsel claim raised in a motion for a new trial, appellate courts should review the court's prejudice ruling for abuse of discretion instead of for correctness because "there is simply no jurist better positioned to assess whether the interest of justice requires a new trial, and whether a trial error or impropriety has caused a substantial adverse effect on the defendant's rights." *Id.* ¶ 47 (Harris, J., concurring) (quotation simplified). Our Supreme Court has granted certiorari to review our holding in that case, perhaps to consider the concurring opinion's noteworthy observations, but pending an opinion from the Court on that issue, we remain bound by precedent and apply a nondeferential standard of review in evaluating both the trial court's deficient performance and prejudice analyses.

elements of the crime charged.") (emphasis added) (quotation otherwise simplified).

¶33 Salazar first asserts that "the district court erred in admitting Shannon's testimony and in declining to strike it even after she admitted that she had no independent memory of most of the events." But he later asserts that "[t]his court should reverse the conviction" and that Trial Counsel "sought this remedy when he made a motion for directed verdict based on the fact that Shannon did not remember what happened." Salazar then takes another turn in his actual analysis and proceeds to quote exclusively from the trial court's order denying his motion for a new trial on this issue and does not cite or quote the court's statements in denying his directed verdict motion.

¶34 In essence, Salazar is presenting three avenues for review: (1) evaluation of the court's decision to admit evidence; (2) evaluation of the court's decision to deny his motion for directed verdict; and (3) evaluation of the court's decision to deny his motion for a new trial. These three avenues, however, do not give rise to the same standard of review. *See State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032 ("The appropriate standard of review for a district court's decision to admit or exclude evidence is abuse of discretion.") (quotation simplified); *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168 ("We review a trial court's ruling on a motion for directed verdict for correctness."); *State v. Colwell*, 2000 UT 8, ¶ 12, 994 P.2d 177 ("When reviewing a trial court's denial of a motion for a new trial, we will not reverse absent a clear abuse of discretion by the trial court.") (quotation simplified). But because Salazar's analysis focuses all but exclusively on the trial court's order denying his motion for a new trial, this would be the avenue we would consider. Given that, we decline to address this issue because, due to our determination that Salazar is entitled to a new trial as a result of Trial Counsel's ineffectiveness, Salazar gets the remedy he is asking for anyway, i.e., a new trial.

ANALYSIS

¶35    Salazar contends that Trial Counsel was ineffective for not using the Voxer messages at trial. Specifically, he asserts that Trial Counsel could not have acted reasonably, and that he was prejudiced as a result, because the messages would have "showed that Shannon lied when she repeatedly and unequivocally testified at the preliminary hearing that she never again contacted [Salazar]."[15]

¶36    An ineffective assistance claim requires a defendant to prove both that (1) "counsel's performance was deficient" and

_____

15. There is some disagreement on appeal regarding Salazar's claim that Trial Counsel performed deficiently in not investigating the Voxer messages. The State argues that Salazar has failed to rebut the presumption that Trial Counsel acted appropriately and investigated the messages because Salazar provides no further information regarding Trial Counsel's efforts beyond stating that he gave the iPod to Trial Counsel. *See State v. Wright*, 2021 UT App 7, ¶ 57, 481 P.3d 479 (stating that if the defendant cannot "point to anything in the record to substantiate what Counsel failed to do," courts "presume that they did what they should have done") (quotation simplified). This is ultimately unimportant to our analysis because even if we accept the State's argument that Trial Counsel is presumed to have investigated the messages, it does not change our conclusion that Trial Counsel was ineffective for not using them at trial. Furthermore, the trial court stated, "There's evidence before me that [Trial Counsel] had them and elected not to use them." Thus, we do not conclude that Trial Counsel failed to investigate the existence of the messages, because he actually had the messages, even though it is suggested by Salazar that Trial Counsel did not have the technical expertise to access and review them. Instead, our analysis focuses on his decision not to use them at trial.

(2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶37 To establish deficient performance, i.e., that counsel's actions "fell below an objective standard of reasonableness," the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 688–89. Indeed, "even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Instead, "the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶38 To establish prejudice, "a defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

## I. Deficient Performance

¶39 Salazar asserts that because this case hinged on Shannon's credibility, Trial Counsel performed deficiently in not introducing the Voxer messages to undermine her credibility. We agree.

¶40 Here, Shannon was the lead witness for the State, and the testimony of the other witnesses called by the State was intended to support her testimony. It may be that the case could have been ably tried a different way, but it was not, and we must analyze Trial Counsel's actions in light of the legal landscape he confronted at the time. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984) ("[A] court deciding an actual ineffectiveness claim

must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed *as of the time* of counsel's conduct.") (emphasis added). Against this background, we conclude that, with Shannon as the State's lead and most critical witness, any reasonable counsel would have presented the Voxer messages to undermine her credibility.

¶41 This case is similar to *Gregg v. State*, 2012 UT 32, 279 P.3d 396. In that case, "Ms. S." alleged that Gregg, whom she had met on a dating website, raped her after they met in person. *Id.* ¶¶ 4, 6. There were no witnesses to the incident, but Ms. S.'s friends came to her apartment soon after the alleged rape and witnessed Ms. S. crying. *Id.* ¶¶ 8–9. Her friends convinced her to go to the hospital for a sexual assault examination, and eventually she contacted the police and charges were filed. *Id.* ¶¶ 9–11. With no physical evidence of or witnesses to the rape, the case hinged largely on Ms. S.'s credibility. *Id.* ¶ 30.

¶42 At trial, Ms. S. testified that she logged onto the dating website "after the alleged rape to aid the police investigation." *Id.* ¶ 23. Gregg was convicted. On appeal, he argued that his trial counsel was ineffective because counsel failed to investigate emails Ms. S. sent to other men on the dating website two days after the alleged rape, which would have undermined her credibility. *Id.*

¶43 Our Supreme Court agreed and reversed. *Id.* ¶¶ 23, 49. It held that because the case hinged on Ms. S.'s credibility, counsel acted unreasonably in not investigating or presenting the emails that would have "directly rebutted" Ms. S.'s claim that she accessed her online dating account only to aid the police. *Id.* ¶ 29. It explained that, "although it is undisputed that a person can be convicted of rape solely on the testimony of the victim, we have nevertheless held that where the conviction is not strongly supported by the record and trial counsel fails to investigate and present evidence impacting the victim's credibility, *Strickland* is met." *Id.* ¶ 30 (quotation simplified).

¶44 Here, much like the situation in *Gregg*, Shannon was the only witness to the event—aside from Salazar and Owner—and her credibility was central to Salazar's conviction. And Shannon's credibility was already in some doubt, more so than was that of Ms. S. in *Gregg*. While Shannon was on the stand, she stated approximately 40 times that she did not remember specifics about the incident. And the jury had to watch, time and again, a recurring exercise through almost the entirety of Shannon's testimony in which the prosecutor showed her documents with highlights and sticky notes in an attempt to refresh her recollection and aid her testimony. Shannon was also not able to keep her story about the soda straight. When first talking to the detective, Shannon stated that she had a soda that made her feel strange before the assault. She repeated that claim to the nurse. But at the preliminary hearing, Shannon testified that the soda did not affect her in any way. And at trial, she testified that she did not remember telling the detective or the nurse about the soda. Thus, there were already cracks in Shannon's credibility.

¶45 Given this backdrop, *see State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (noting that when analyzing whether trial counsel's performance was unreasonable courts must consider "all the circumstances"), just as it was unreasonable for counsel in *Gregg* not to present the emails to undercut Ms. S.'s credibility, it was likewise unreasonable for Trial Counsel in this case not to use the Voxer messages to undercut Shannon's already problematic credibility. At the preliminary hearing, Shannon categorically stated that, following a few messages sent soon after the assault that she reported to the police, she blocked Salazar and had no further contact with him. Then, at trial, she testified that she did not "recall having contact or socializing with . . . Salazar after the [incident]" but simply stated, "I was told that I reported something before to the cops, but I don't remember." And Shannon did state that it was "correct" that "at the preliminary hearing under oath [she] said that [she] would never have had contact with [Salazar] after the fact" and that if she ran into him,

"it probably wouldn't have been a big deal" because she was "just trying to put it all behind [her]." The Voxer messages, therefore, would have directly contradicted Shannon's statements at the preliminary hearing and at trial, and would likely have undermined her credibility in the eyes of the jury, in conjunction with her inability to remember most of the specifics of the assault without the prosecutor's direction and her changing story about the soda. Thus, just as in *Gregg*, because "the conviction is not strongly supported by the record and trial counsel fail[ed] to . . . present evidence impacting the victim's credibility," Trial Counsel's failure to present the Voxer messages at trial was objectively unreasonable. *See* 2012 UT 32, ¶ 30.

¶46 The State argues that *Gregg* is distinguishable from this case. It contends that in *Gregg*, there was no "independent physical evidence that supported or contradicted the victim's testimony" whereas here, the nurse testified that Shannon's injuries were the worst she had ever seen. We disagree. While the nurse did, in fact, testify that the injuries were the worst she had seen, she still conceded that they could have come from consensual sex, so the exam did not categorically establish that a non-consensual encounter occurred.[16] This is not such compelling "physical evidence" of a rape that it shifts the

---

16. In *State v. Torres-Orellana*, 2021 UT App 74, 493 P.3d 711, *cert. granted*, 502 P.3d 268 (Utah 2021), we held that the degree of the injuries the victim sustained to her genitals was indicative of non-consensual sex. *See id.* ¶ 35. But in that case, the severity of the injuries was also accompanied by the examining nurse's testimony that "the number and seriousness of the injuries [the victim] suffered to her genital area . . . were caused by 'several different motions,' which was highly indicative of non-consensual sex." *Id.* ¶ 39. *See id.* ¶ 35. *Torres-Orellana* is therefore distinguishable from the case now before us because no such testimony appears in our record.

evidentiary picture from solely relying on Shannon's credibility and distinguishes our case from *Gregg*. The case still primarily hinged on Shannon's testimony just as it did on Ms. S.'s testimony in *Gregg*. And the nurse's testimony did not so alter the evidentiary landscape as to change that.

¶47   The State also argues that this case is distinguishable because there is no indication that the prosecutor in *Gregg* "was poised to rebut the unpresented emails . . . with a rape-myth expert." As we discuss later, *see infra* ¶¶ 49–50, the threat of a rape-myth expert was overblown in the context of the Voxer messages and does not significantly distinguish this case from *Gregg*. The messages would properly have been used only to attack Shannon's credibility and would not have been used to suggest that Shannon's behavior after the alleged assault was indicative of someone who had not been raped. Thus, there would have been no logical connection between the rape-myth expert's testimony and whether Shannon was a credible witness.

¶48   Finally, the State argues that "unlike the unpresented impeachment evidence in *Gregg* . . . , the Voxer evidence would have been relevant only to a side issue, not the central issues in the case." This argument is equally unpersuasive. In *Gregg*, the unpresented emails went only to the issue of Ms. S.'s credibility because she testified at trial that she did not use her online dating account after the rape except to help police, when in fact she continued to use it to send messages to other men. Here, the evidence was on the same footing, as Shannon said she never contacted Salazar after the assault while the Voxer messages show that she did. We cannot see how the Voxer messages are simply "a side issue" in this case while the messages in *Gregg* went to "the central issues in the case." In both cases, the impeachment evidence showed that the complaining witnesses were not completely credible in their testimony, and in both cases the underlying inconsistencies were unrelated to the alleged assault.

¶49 Here, the trial court did not analyze the reasonableness of Trial Counsel's performance but instead dismissed Salazar's claim because it ruled that Salazar could not show prejudice. The State, however, provides three reasons on appeal why Trial Counsel could have reasonably decided not to use the Voxer messages.

¶50 First, the State asserts that Trial Counsel could have been "reasonably concerned that the jury would still believe Shannon's testimony . . . even if counsel used the Voxer messages, because the Voxer evidence said nothing about whether Shannon consented to a threesome in the closet that night." This argument misses the point. Properly viewed, the Voxer messages had nothing to do with the claimed assault and dealt only with Shannon's credibility. She had testified that she did not have contact with Salazar after the rape, except right after the incident, following which she blocked him and reported the contact to the police. But the Voxer messages show that she did have further contact with Salazar. A decision by Trial Counsel not to use the messages as impeachment evidence because he feared that the jury might nonetheless find Shannon credible and still believe her account of the assault would not be reasonable and would be an abdication of counsel's "duty" to make "the trial a reliable adversarial testing process." *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Credibility is ultimately the jury's call, to be sure, but when a case turns on credibility, competent representation will include giving the jury relevant information to help it gauge the credibility of a critical adverse witness.

¶51 Second, the State posits that Trial Counsel also had to consider "whether he could lay foundation for or authenticate the Voxer messages." This argument is also unpersuasive. With the exception of a single text message, the Voxer messages were voice messages sent from Shannon, and almost any of the witnesses at trial could have authenticated them based on their familiarity with her voice. *See* Utah R. Evid. 901(a), (b)(5) (stating

that "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker" is "evidence that satisfies" "the requirement of authenticating or identifying an item of evidence"). Indeed, Shannon herself could presumably have authenticated them. Thus, Trial Counsel could have easily authenticated the messages, and this minimal hurdle would not have deterred reasonable counsel from presenting them.

¶52 Third, the State asserts that Trial Counsel acted reasonably because he "knew from his discussions with the prosecutor that if he introduced the Voxer evidence for *any* purpose, including attempting to impeach Shannon's testimony . . . , the prosecutor would call a rape-myth expert to explain her counterintuitive behavior." The State reads too much into this possibility. The prosecutor did not inform Trial Counsel that if he presented the Voxer messages for *any* purpose, such as to attack Shannon's credibility, the prosecutor would call a rape-myth expert. In fact, when responding to Salazar's claim about Trial Counsel not calling Junior and Tim, the prosecutor argued that Salazar "wants this court to buy into the idea that a 'victim' should respond to their rapist in some standardized manner, but research shows this simply is not true." The prosecutor explained, with our emphasis, that "there was discussion between the parties about the potential of the State calling a 'Rape Myth' expert which did not occur" because Trial Counsel "made the decision not to pursue *this theory* of the case." Then, when responding directly to Salazar's Voxer arguments, the prosecutor noted that when the messages "were located, the State would need to evaluate them and determine whether a . . . rape myth expert would have been required." Thus, it is clear the prosecutor's threat to call such an expert hinged primarily on the notion that if Trial Counsel used the Voxer messages to suggest that Shannon's *behavior* after the incident was counterintuitive, the prosecutor would call the expert to put that

evidence into proper context. The State understandably said nothing about calling the expert if the messages were used only to undermine Shannon's credibility. Thus, this threat of calling an expert witness is not a basis on which to conclude that Trial Counsel acted reasonably. Trial Counsel could have made clear to the court and the jury that the defense did not in any way contend that the Voxer messages showed that Shannon consented to the sexual encounter with Salazar and Owner, foreclosing any relevance of a rape-myth expert, while hammering home the argument that the messages showed Shannon was not a credible witness.

¶53   But even if a rape-myth expert had been called to testify, notwithstanding Trial Counsel's position, the jury would have recognized that there was no logical connection between the expert's testimony and the reason the evidence was being presented. Thus, reasonable counsel would have pressed forward and presented this critical credibility evidence. Ultimately, we agree with Salazar that "Shannon's friendly behavior after the incident had little if any probative value" as concerns consent. "But her lying about [the post-rape contact] had enormous probative value . . . . So it would not have mattered if the prosecution called a rape-myth expert."

## II. Prejudice

¶54   Having concluded that Trial Counsel performed deficiently in not introducing the Voxer messages at trial, we must now determine whether Salazar was prejudiced as a result. Salazar contends that Trial Counsel's deficient performance prejudiced him because Shannon's "testimony was the only direct evidence of guilt" and thus "[t]here is a reasonable probability that the outcome would have changed if the jury heard that Shannon had perjured herself." Without embracing Salazar's perjury characterization, we agree with Salazar's basic point.

¶55    Here, the trial court ruled that Salazar had not been prejudiced by Trial Counsel's failure to use the Voxer messages. It found that while Shannon did testify that she had no contact with Salazar after the assault, she did state "that she had forgotten she exchanged messages with [Salazar] and reported the messages to the police." Thus, the trial court determined, "presenting the Voxer messages to the jury would have confirmed [Shannon's] testimony as much as it would have impeached it." This is incorrect.

¶56    Although Shannon did say she had forgotten about the messages that she reported to the police, those messages were ones she earlier said had been received in the days immediately after the alleged assault. The Voxer messages, on the other hand, were exchanged approximately three months after the incident, at a point in time when Shannon had been adamant that she had no deliberate contact with Salazar. Thus, the Voxer messages would not have confirmed Shannon's testimony. On the contrary, they would have demonstrated, at a minimum, that Shannon had yet more memory gaps regarding her communication with Salazar and, potentially, that she had lied about having contact with Salazar later.[17] Thus, the Voxer

---

17. While Shannon was obviously not a stellar witness, the jury might have been inclined to cut her some slack because of the traumatic event she described, perhaps concluding that it would be reasonable for her to have blocked some details from her memory during the seven-year gap between the incident and trial. But the exchanges shown by the Voxer messages are not the kind of incidental communication one would somehow forget. Over a period of roughly eight days, Shannon sent twenty voice messages and one text message to Salazar in which she invited Salazar to come hang out with her, discussed joining the Air Force, talked about a car accident she was in, and spoke of her father's cancer diagnosis.

messages would have further undercut Shannon's credibility, not strengthened it.

¶57 The trial court also ruled that even if the jury had reasoned that the Voxer messages indicated Shannon lied at the preliminary hearing, the jury could still have found her credible at trial. While this is true in the abstract—the jury could conclude she lied before but was truthful at trial or even that while lying about her later encounters with Salazar she was nonetheless truthful about her claims of rape—it is not dispositive. The court based its reasoning primarily on the fact that Shannon's "testimony was corroborated by [Friend's] testimony and was consistent with statements she made to [the nurse] and [Coworker]." We disagree that this "corroborating" testimony was so strong as to overcome any likely change in the result at trial had the jury been presented with the Voxer messages.

¶58 Shannon was the lead witness in the case, and the State's prospects for a conviction primarily rested on her testimony. Thus, every sound challenge to her credibility, which was already on shaky ground, significantly increased the chances that the jury would find her incredible as a witness, undercutting the State's ability to demonstrate Salazar's guilt beyond a reasonable doubt. True, there was testimony from individuals about Shannon's emotional state that evening, just as there was in *Gregg*, along with testimony from the nurse that Shannon's injuries were the worst she had ever seen. But the nurse conceded that the injuries did not prove lack of consent. And there "was no independent physical evidence that supported or contradicted [Shannon's] testimony, and therefore, the conviction is not strongly supported by the record." *See Gregg v. State*, 2012 UT 32, ¶ 30, 279 P.3d 396.

¶59 Accordingly, we are persuaded that the jury's view of Shannon's credibility would likely have been materially different if the Voxer messages had been presented to it. Given Shannon's

problematic testimony and the lack of necessarily inculpatory physical evidence, the Voxer messages would have "affected the overall evidentiary picture," *see id.*, and the jury may well have found Shannon less credible, regardless of the other testimony. Thus, had Trial Counsel further undercut Shannon's credibility by introducing the Voxer messages, "there is a reasonable probability that . . . the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). *See also State v. Larrabee*, 2013 UT 70, ¶¶ 35–37, 321 P.3d 1136 (holding that counsel's deficient performance prejudiced the defendant when there was little physical evidence and the case turned on the victim's credibility); *Gregg*, 2012 UT 32, ¶¶ 26–28 (same); *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) (same); *State v. Bujan*, 2006 UT App 322, ¶ 32, 142 P.3d 581 (same), *aff'd*, 2008 UT 47, 190 P.3d 1255.

## CONCLUSION

¶60　Trial Counsel performed deficiently in not introducing the Voxer messages at trial, and this failure prejudiced Salazar. We therefore reverse Salazar's conviction and remand for a new trial.

———————