**2025 UT App 142**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OSCAR SALAS VARGAS,
Appellant.

Opinion
No. 20230226-CA
Filed October 2, 2025

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 201900005

Matthew R. Howell, Attorney for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which JUDGES
RYAN D. TENNEY and AMY J. OLIVER concurred. JUDGE RYAN D.
TENNEY authored a concurring opinion, which JUDGES JOHN D.
LUTHY and AMY J. OLIVER joined.

LUTHY, Judge:

¶1      Oscar Salas Vargas appeals his conviction of rape, arguing
that he was denied the effective assistance of counsel because his
trial counsel (Counsel) did not offer into evidence an unaltered
version of a video Vargas took of the naked victim after the rape
(the State had played for the jury a version of the video that
blurred the victim's body) and because Counsel failed to object to
a hearsay statement made by the victim in a text message to
Vargas after the rape. Vargas also argues that there was
insufficient evidence to support the verdict because the victim's
testimony was inherently improbable. We conclude that Vargas
has failed to show he received ineffective assistance of counsel

and that he has failed to demonstrate that the victim's testimony was inherently improbable. We therefore affirm.

BACKGROUND[1]

*The Rape*

¶2     Vargas and Kylee[2] connected with each other on social media through mutual friends. Over the course of the next year or two, Vargas occasionally messaged Kylee and, at some point, started asking her out. Eventually, Kylee agreed to go on a date. The two met at a restaurant for dinner and stayed for two or three hours. During that time, as they "chatted, getting to know each other," Kylee had "a couple beers" and "one or two shots" of "Jägerbomb," a cocktail of Jägermeister liqueur and an energy drink.

¶3     When Vargas and Kylee left the restaurant, "it was still fairly early . . . and [they] were having a good time," so they decided to go to a bar about five minutes away. Vargas, who had a motorcycle, put his helmet in Kylee's car, and they rode his motorcycle together to the bar. At the bar, they shared a pitcher or two of beer, and Kylee had a couple more shots of Jägerbomb. Vargas "asked if he could kiss [Kylee]," and she accepted "a normal[,] soft, regular kiss." Later, when they went onto the bar's patio for Kylee to smoke, Vargas "kissed [her] again and then . . . started getting handsy." She "smacked his hand," told him to calm down, and said, "You're not getting anything from me

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565 (cleaned up).

2. A pseudonym.

tonight. I don't do that." Vargas said that was "not a problem" and he "under[stood]." Then they went back inside.

¶4 By that time, the bar was getting ready to close, so Vargas and Kylee left and got on his motorcycle with "the original plan" of "going back to [her] car so [she] could go home"—Kylee's teenage son was at home and she had to work "super early" the next morning. Vargas suggested, however, that they "just stop for one more drink." Kylee agreed, and they went to another bar "just down the street."

¶5 When they arrived at the bar down the street, Kylee went into the bathroom. Vargas told the bartender (Bartender) that he and Kylee "were staying in the hotel across the parking lot." When Kylee returned, Vargas "had bought [them] shots" of what she believed to be Jägerbomb. Kylee had one, and then some of her friends walked into the bar. Vargas "immediately . . . started buying rounds of shots for all of [them]." Kylee "took one more" and then told Bartender that she was done drinking.

¶6 At that point, Kylee "was drunk" and "feeling nauseous." She went to the bathroom again and "started puking" "a lot." This was unusual for Kylee; although she had gotten drunk before, she had "never puke[d]" as a result and had not "ever been nauseous like that." By the time she was done vomiting, she was "completely weak," "shaking," and having "hot and cold sweats." She felt as though her "legs were going to give out" and "like [she] was going to pass out." Kylee told Vargas that she did not feel well and that she needed him to take her to her car so she could go home.

¶7 When they got to Vargas's motorcycle, Vargas told Kylee, "I'm too drunk to drive. I can't drive. We need to get a hotel room." Kylee "told him no" and that she "just want[ed] to go . . . to [her] car." Vargas repeated that he could not drive and said that he "just need[ed] to get a room to sober up for a minute." Kylee suggested that they go back into the bar instead, but Vargas told

her it was closed. Although Kylee did not believe the bar was closed, due to her physical condition, she agreed to get a hotel room. Vargas then "walked [Kylee] across the street" to a hotel and "left [her] in the parking lot . . . while he went in to . . . get a room." Vargas soon returned to Kylee and told her that the hotel had no rooms available. He then "walked [her] across the street again to another hotel" and once more "left [her] in the parking lot" while he went inside. Kylee sat down on the curb and smoked a cigarette.

¶8      After Vargas secured a room, he came out and helped Kylee up.[3] As they started to walk toward the hotel entrance, Vargas momentarily let go of Kylee's hand, but he offered his hand again and she took it. They made their way into the hotel holding hands, with Kylee walking unsteadily. As they went down the hallway leading to their room, Kylee was unable to walk straight. She was "swaying and feeling like [she] was not going to make it to where [they] were going." The two walked past the door to their room and then stopped, and Kylee reached out to steady herself against the hallway wall. Vargas let go of her hand to turn back toward their room, and Kylee shuffled the other direction across the hallway. She put her hand up to steady herself against the opposite wall and then turned back and crossed the hall again, this time toward their room. While Vargas attempted to open the door to their room, Kylee walked into the wall next to

---

3. As noted below, *see infra* ¶¶ 18, 24, the hotel later provided law enforcement with surveillance camera video footage (without audio) of Vargas and Kylee. Other than the quotation regarding how Kylee felt at the time, which comes from Kylee's testimony, the facts in this paragraph come from the hotel surveillance videos. Additional facts recited below regarding timing and occurrences that could be seen in the hotel hallway or parking lot also come from or are confirmed by the surveillance videos.

him. She then steadied herself with her hand against the wall and, finally, followed him into the room.

¶9 Once in the room, Kylee removed her jacket, fell onto the bed, and "pass[ed] out." About a minute later, Vargas left and retrieved his motorcycle from the bar where he had left it, parking it under the covered driveway outside the hotel's entrance. The time was 3:02 a.m.

¶10 Sometime later that morning, Kylee began "coming in and out of consciousness." Her shirt and bra were around her neck, and Vargas was "having sex with [her] or fingering [her] or doing something"—Kylee later could "just remember pressure down there" and that "stuff was happening." She then lapsed back into sleep or unconsciousness.

¶11 The next time Kylee awoke, her bra and shirt were no longer on her and Vargas "was behind [her], holding onto [her] . . . stomach and [her] hips, having sex with [her]." "His penis was in [her] vagina," penetrating her from behind. When Kylee realized what was happening, she "stopped him." Vargas responded, "Oh, get on top." Kylee said, "No." And Vargas replied, "Come on, . . . let's continue making love." Kylee told him, "No. We were having sex. We weren't making love. You were having sex with me. I was passed out. I was sleeping." Vargas suggested that they "call into work, make a day of it," "just lay in bed and have sex," and then "go to brunch." Kylee again told him no and went into the bathroom to "clean[] [herself] up a little bit." She "felt more hung over than [she'd] ever felt in [her] life."

¶12 While Kylee was in the bathroom, Vargas, who was sitting in the bed, took his phone out and, without Kylee's knowledge, began recording a video. When Kylee exited the bathroom, he recorded her as she walked naked in front of the bed—from the bathroom on his left to the side of the bed on his right. He continued to record as she picked her clothes up off the floor

beside the bed, turned her back to him, and began putting her clothes on. Kylee never noticed that Vargas was recording her.

¶13    Kylee then searched the hotel room for her phone and wallet but could not find them. After Vargas dressed, Vargas and Kylee left the room. The time was 7:40 a.m. Kylee paused outside the room, looking both directions down the hallway, and said something to Vargas while gesturing both directions, appearing to be unsure of which way to go. Vargas began walking in the direction of the hotel's entrance. Kylee was still feeling "[s]ick" and "nauseous" and was "having hot and cold sweats like [she] was ready to puke again," though she did not feel "as bad as the night before." Kylee "knew [she] was going to be late for work," and she worried that she "was going to get in trouble."

¶14    When the pair went outside, Kylee was confused to see Vargas's motorcycle at the hotel, and she asked him "how his bike got back to the hotel." He told her, "[R]emember last night you were standing out here talking to some girl and having a smoke, and I went and got my bike and brought it over." Kylee replied, "[N]o, you're lying. That never happened. I never spoke to anybody last night [and] you didn't bring your bike over." Kylee then saw her phone and wallet sitting on the curb where she had placed them the night before while waiting for Vargas to get a room. She went and retrieved them, and Vargas started his motorcycle. Vargas then "said that he [had forgotten] his shirt," and he went back to the room to get it. Vargas returned without having found his shirt, but he soon discovered that "he had put it in the saddle bag [of his motorcycle] already."

¶15    Vargas mounted his motorcycle, and Kylee came alongside, preparing to get on behind him. Vargas put his arm around Kylee's waist and pulled her toward him to give her a kiss, and she kissed him. She then got on the motorcycle, Vargas took her to her car, and she drove herself home. As soon as she arrived, Vargas called and told her that he had left his helmet in her car.

She texted him her address and left the helmet on the trunk of her car so he could retrieve it. She then got ready and went to work.

¶16    At work, Kylee told a coworker friend (Coworker) what happened with Vargas. She explained that she had woken up partially naked and had asked Vargas "if she'd had sex." She told Coworker that "she thought that they had sex, and she didn't consent to that." Coworker told Kylee she "needed to call the cops and report" the incident. Feeling "scared" and "ashamed that it happened to [her]," Kylee did not call the police "right away." Four days later, however, after telling another coworker about the incident and receiving the same advice, Kylee reported the assault to the police.

*The Investigation and Charges*

¶17    The first officer Kylee spoke to (Officer) advised her to get a sexual assault examination, which she did the next day. During the exam, Kylee gave the nurse (Nurse) a description of the assault and the events leading up to it. Among other things, she told Nurse that when she and Vargas arrived at the hotel room, she "blacked out," "falling kind of flat face first on the bed," and that the next thing she remembered was waking up and being "pretty much . . . naked with [Vargas] on top of [her] and having sex with [her]." She told Nurse that at one point later in the morning, she reminded Vargas that she "couldn't even walk" into the hotel and that he "basically had to carry [her]."

¶18    After Nurse's examination, a detective (Detective) interviewed Kylee. Kylee recounted the assault and the events leading up to it. After interviewing Kylee, Detective collected surveillance videos from the hotel and interviewed Vargas.

¶19    During Detective's interview of Vargas, Vargas described his date with Kylee, including their meeting for dinner, going to two bars, and getting a hotel room because he had been drinking and was not going to drive. Vargas said that after they got into the

hotel room, he and Kylee "just fell asleep," that after they woke up later in the morning they "ma[de] out," and that he then gave Kylee a ride to her car. Detective informed Vargas that Kylee was "alleging that a little more happened in the hotel room and that it wasn't necessarily consensual"—specifically, that "she woke up to [Vargas] having sex with her with . . . all her clothes off." Vargas said, "No. No, that's not true." And he told Detective he had text messages and a video to support his claim.

¶20    Vargas then showed Detective a string of messages he and Kylee had exchanged over the evening they went out, the next day, and the few days following that. Among them was a message from Vargas thanking Kylee for the date and one from her responding, "Ya thanks." Vargas explained that a couple days later, he had seen that Kylee had posted online that she was having car trouble. So he texted her again, saying, "Hi Beautiful, What are you doing? What's wrong with your car?" Kylee responded, "I'm working and nothing you need to worry about." Vargas replied, "Ouch! Are you upset with me?" Kylee said, "Ya I am." Vargas asked, "Why?" And Kylee replied, "Because you totally took advantage the other night and I'm not ok with it." After reviewing these texts with Detective, Vargas explained that he "didn't understand why" Kylee was upset because what happened in the hotel room was "consensual."

¶21    Vargas then showed Detective the video he had recorded of Kylee naked in the room. Vargas explained that he had been "just basically . . . taking a video of the room" when Kylee came out of the bathroom. As Vargas and Detective watched the video, Vargas commented (regarding Kylee in the video), "She doesn't look like she's upset with me at all." He asserted that if someone was "molested" as Kylee had claimed, "she wouldn't just walk out so casually like that." Vargas then acknowledged that the two of them "had intercourse."

*The Trial*

¶22    Vargas was charged with rape, and the case proceeded to a jury trial. During opening statements, the prosecutor told the jury about the text messages and video Vargas had shown to Detective. He informed the jury that the State would show the video during trial but that it had "blurred" the video "just to protect [Kylee's] privacy" because she did not "have any clothes on" in the video.

¶23    Following opening statements, Kylee, Coworker, Officer, Detective, Nurse, Bartender, and a nurse practitioner "familiar with the effects of alcohol upon individuals" each testified for the State. Kylee testified about the date and the assault consistently with the facts set forth above. Detective testified about his interviews with Kylee and Vargas, and during his testimony, the State introduced a video of the interview with Vargas. Coworker and Nurse testified to the respective accounts of the assault that Kylee had given them, as also described above. And Coworker further testified about Kylee's demeanor after the assault. She said that when Kylee arrived at work that morning, she was not herself—"very mumbly, very closed off," "not confident"—and that "[h]er posture was very shriveled down." Coworker also testified that for some time thereafter, Kylee "would have full blown panic attack[s] at work," "was not sleeping at all," "became a crier on a daily basis," and "couldn't stand to be in . . . confined spaces." The State's other witnesses—Bartender and the nurse practitioner—provided additional relevant testimony consistent with the facts outlined above.

¶24    During Kylee's testimony, the State introduced two surveillance videos from the hotel where she and Vargas had stayed. One depicted Vargas and Kylee in the parking lot before they entered the hotel, Vargas in the lobby getting a room, Vargas helping Kylee up from the curb and walking with her into the hotel, the two of them walking down the hallway to their room,

and Vargas leaving to retrieve his motorcycle. The other showed Vargas and Kylee exiting their room later that morning and their activity outside the hotel before riding away on Vargas's motorcycle. When this video was played, Kylee was asked to explain why she gave Vargas a kiss before they rode away. She said, "He grabbed me and was pulling me in, so I kissed him." The State also introduced, without objection, the video and text messages Vargas had shown to Detective. Before showing the video to the jury, the prosecutor stated, "I'm going to warn the jury this is graphic, but we have blurred it"—in the version of the video shown to the jury, Kylee's naked body was blurred from the neck down. That video was then played for the jury.

¶25    On cross-examination, Counsel pressed Kylee on a number of topics. He asked whether she told Nurse that Vargas had "picked [her] up and carried [her] to the room." Kylee responded, "Well, my carry version's different than everybody else's, but yes." Counsel asked whether Kylee remembered telling Nurse that when she woke up, Vargas "was on top of [her] having sex." Kylee could not remember saying that Vargas was on top of her. Counsel then asked Kylee to confirm whether she had "actually black[ed] out" or had "just [felt] really woozy." Kylee said that she had "[j]ust [felt] really woozy" but that she had blacked out "[a]t the hotel" after "[falling] onto the bed." Finally, after obtaining Kylee's acknowledgement that she told Officer that when she woke up in the hotel room she "wanted to punch [Vargas] in the face," Counsel queried, "You were scared, you were mad?" Kylee replied, "Yeah, because he kept trying to pull me back into bed."

¶26    On redirect, the prosecutor followed up on Kylee's statement to Nurse that Vargas had carried her to the hotel room:

> Q.    [L]et's talk a little bit about what "carry" means. Like what did you mean by that?

> A.     Carry means helping me, assisting me, not like physically carrying me.
>
> Q.     Okay, would dragging be a better word?
>
> A.     I'm not saying necessarily dragging, but I couldn't walk by myself straight.
>
> Q.     Okay, so when he's holding your hand, why is he holding your hand?
>
> A.     To help guide me.
>
> Q.     Okay, could you have walked straight without him holding your hand?
>
> A.     No.
>
> Q.     As you were going to the hotel room?
>
> A.     I mean, I could have a little bit, but not straight straight, no. I would have been falling into the walls.

¶27     The prosecutor also asked Kylee about her statement to Nurse that she woke up with Vargas on top of her:

> Q.     So why would you have said "on top" to [Nurse]?
>
> A.     I don't know. Because part of it was on top just a little bit because he was kind of—he was behind me, but he was raised up on his upper body holding onto me.
>
> Q.     When he was behind you . . . was any part of his body on top of you?

A.    Just his arms and like his shoulder part, that I remember . . . .

Q.    Okay, how was your body positioned?

A.    I just remember being on my side turned a little bit.

Q.    Turned towards him or away from him?

A.    Away from him.

¶28    Following the testimony from its witnesses, the State rested. The defense then rested without calling any witnesses.

*The Verdict, Motion to Arrest Judgment, and Appeal*

¶29    The jury convicted Vargas of rape. Vargas then filed a motion to arrest judgment, arguing that Kylee's testimony was inherently improbable under *State v. Robbins*, 2009 UT 23, 210 P.3d 288, and that without her testimony there was insufficient evidence to support the verdict. The court denied that motion, and Vargas timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶30    On appeal, Vargas asserts two ineffective assistance of counsel claims. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (cleaned up).

¶31    Vargas also asserts that the district court erred when it denied his motion to arrest judgment. We review for correctness a district court's grant or denial of a motion to arrest judgment. *See State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251.

ANALYSIS

I. Ineffective Assistance of Counsel

¶32 Vargas asserts that Counsel provided ineffective assistance in two ways: (1) by not offering into evidence an unaltered version of the video Vargas recorded of Kylee in the hotel room and (2) by not objecting to Kylee's text message to Vargas stating, "[Y]ou totally took advantage the other night and I'm not ok with it." For a claim of ineffective assistance of counsel, a defendant must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense" by "depriv[ing] the defendant of a fair trial." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. Here, we conclude that Vargas's first ineffective assistance claim fails because Counsel did not perform deficiently and that his second claim fails because Vargas has not shown that Counsel's assertedly deficient performance prejudiced Vargas's defense. We address each claim in turn.

A.     The Video of Kylee in the Hotel Room

¶33 Vargas contends that Counsel performed deficiently by not offering into evidence an unaltered version of the video Vargas recorded of Kylee in the hotel room. To establish deficient performance, "a defendant must show that counsel's representation fell below an objective standard of reasonableness." *State v. Lee*, 2014 UT App 4, ¶ 13, 318 P.3d 1164 (cleaned up). "In evaluating whether counsel was deficient, we will not second-guess trial counsel's legitimate strategic choices. Rather, if there is a conceivable tactical basis for counsel's actions, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* ¶ 17 (cleaned up).

¶34    Vargas's claim of deficient performance relies on the proposition that the *only* reasonable defense strategy under the circumstances of this case was for Counsel to show the jury the unaltered video of Kylee naked in the hotel room after the State had already shown the jury a version of the video that blurred her body. He asserts that only the unaltered version of the video would have adequately undermined Kylee's credibility because (1) it showed "that [she] was comfortable enough in Vargas's presence (only minutes after the alleged rape) to walk around the room completely naked," conduct assertedly at odds with her claimed lack of consent to sexual intercourse; (2) it showed that Kylee, "while naked, turned her back on Vargas while putting her clothes on" and "did not make any effort to hide herself or retreat back in the bathroom, or even to cover herself up with a towel or sheet," suggesting she was not afraid of him as she had claimed; and (3) it showed that, "even though her clothes were outside her line of sight, she walked straight to them from the bathroom," assertedly "demonstrat[ing] that [she] knew exactly where her clothes were," contrary to her claim of having woken up naked with no recollection of how or when her clothes were removed.

¶35    The flaw in Vargas's argument on this point is that even the altered version of the video shows that Kylee walked around the room naked; that she turned her back to Vargas to put her clothes on, making no effort to hide, cover herself (other than with her clothes), or retreat to the bathroom; and that she walked straight to her clothes, even though they were outside her line of sight as she exited the bathroom. Thus, reasonable counsel could have decided that there was no need to offer the unaltered version of the video to persuade the jury of these facts.

¶36    Vargas insists, however, that showing the unaltered version of the video was necessary for the jury to "[feel] the impact" of Kylee being in front of Vargas "without any shame or hesitancy, fully naked." The "shock value," "gut reaction," or "feeling" the jury would have experienced from seeing Kylee's

unblurred nakedness, Vargas explained at oral argument, "would have had . . . an impact on the jury's decision" in a way that seeing the altered version of the video would not. By analogy, Vargas reasons, just as the horror of the Holocaust is brought home to viewers more by seeing stark videos of its victims than by merely hearing about the atrocities they suffered, the "reality" of Kylee's asserted lack of credibility would have been better brought home to jurors who saw her starkly naked body than to jurors who knew she was naked but saw her body blurred. This argument suffers from multiple infirmities, particularly in the ineffective assistance of counsel context.

¶37   First, rule 403 of the Utah Rules of Evidence "allows for the exclusion of otherwise relevant evidence if the evidence's probative value is substantially outweighed by a danger of unfair prejudice." *State v. Herrera*, 2025 UT App 1, ¶ 34, 563 P.3d 416 (cleaned up). "Unfair prejudice results . . . where the evidence has an undue tendency to suggest decision upon an improper basis," and "an improper basis can include emotional decision-making." *Id.* (cleaned up). Thus, to the extent Vargas's argument might be construed as suggesting that Counsel was required to offer the unaltered video solely for its "shock value" or the emotional "gut reaction" or "feeling" it would have engendered, the argument is not well taken. Reasonable counsel could have concluded that the court would not have allowed the unaltered video to be admitted for that purpose and, thus, not made a futile attempt to offer it on that basis. *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (cleaned up)).

¶38   Vargas asserts, however, that legitimate probative value of the unaltered video is found in the fact that credibility determinations are best made by factfinders who are able to observe a witness's demeanor. *See generally Ashby v. State*, 2023 UT

19, ¶ 72, 535 P.3d 828 (explaining that one who has an "opportunity to observe firsthand a witness's appearance . . . [and] demeanor" is "in a superior position to assess credibility" compared to one who is not (cleaned up)). He reasons that the credibility of Kylee's in-court assertions that she did not consent to intercourse and was "scared" of Vargas after she awoke with him that morning would have been best judged by jurors who were able to see her demeanor that morning unobstructed by the blurring of her body. But even if we credit the logic of Vargas's argument, we cannot ignore the countervailing considerations Counsel would have had to grapple with.

¶39 Specifically, the Utah Constitution provides that victims of crimes have the right "[t]o be treated with fairness, respect, and dignity, and to be free from harassment and abuse throughout the criminal justice process." Utah Const. art. 1, § 28(1)(a). To protect that right, our legislature has directed that the State "shall ensure that all victims and witnesses of crime are treated with dignity, respect, courtesy, and sensitivity." Utah Code § 77-37-1(1)(b). Rule 611 of the Utah Rules of Evidence therefore empowers courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . protect witnesses from harassment or undue embarrassment." Utah R. Evid. 611(a)(3). And our caselaw further indicates that an appropriate factor for a court to consider under rule 403 is the danger the proposed evidence poses of unfair prejudice to the victim through unwarranted invasion of the victim's privacy. *See State v. Rallison*, 2023 UT App 34, ¶ 26, 528 P.3d 1235 ("Evidence may . . . cause unfair prejudice when it reveals intimate and potentially embarrassing details about victims." (cleaned up)). Thus here, Counsel could have reasonably decided that it would have been futile to ask the court to determine that the marginal probative value of having the jury see Kylee's body unblurred was not overcome by her rights to respect and dignity and was not substantially outweighed by the danger of unfair prejudice to Kylee from the public exhibition of her nude body.

¶40 Moreover, Counsel could have reasonably concluded that, rather than aid Vargas's defense, playing the unaltered video would have backfired with the jury. Vargas was accused of raping Kylee. His recording of her while she was naked and without her consent had already worked an invasion of her privacy and suggested a disregard for her autonomy. The prosecutor had noted for the jury both the "graphic" nature of the video and the State's effort to "protect [Kylee's] privacy." And in the blurred version of the video, the jury had already seen that Kylee walked naked in front of Vargas; proceeded directly to her clothes, which were lying out of her line of sight as she exited the bathroom; and turned her back to him as she dressed. At that point, any insistence by Counsel on showing the unaltered video might have been viewed by jurors as an unnecessary and callous revictimization of Kylee. And they might very well have viewed Vargas more negatively as a result. Recognizing as much, Counsel could have reasonably decided that any benefit to be gained by showing the unaltered video was outweighed by the risks it posed. Because Counsel thus had a conceivable tactical basis for his actions, Vargas has not overcome the presumption that, under the circumstances, Counsel's conduct amounted to sound trial strategy. *See State v. Lee*, 2014 UT App 4, ¶ 17, 318 P.3d 1164.

¶41 Finally, Vargas seeks to foreclose the foregoing conclusion by arguing that under *State v. Salazar*, 2022 UT App 38, 509 P.3d 198, Counsel was required to introduce the unaltered video despite the risks it posed to Vargas's defense. Vargas bases this argument on our statement in *Salazar*—quoting *Gregg v. State*, 2012 UT 32, ¶ 30, 279 P.3d 396—that "where [a] conviction is not strongly supported by the record and trial counsel fails to . . . present evidence impacting the victim's credibility," ineffective assistance of counsel has been shown. 2022 UT App 38, ¶ 43 (cleaned up). Vargas interprets this statement as creating a brightline rule that applies in this case, requiring Counsel to put on the evidence. We disagree for multiple reasons.

¶42    First, Vargas mischaracterizes his conviction as not being strongly supported by the record. We implicitly characterized the conviction in *Salazar* as having not been strongly supported by the record because (1) the alleged rape victim in that case "was the only witness to the event" aside from her two alleged attackers; (2) "[w]hile [she] was on the stand, she stated approximately 40 times that she did not remember specifics about the incident"; and (3) she was "not able to keep her story . . . straight" as to whether a soda she drank before the alleged assault "made her feel strange" or "did not affect her in any way." *Id.* ¶ 44. And in *Gregg*—the case on which *Salazar* largely relied and in which the only issue was whether the alleged victim had consented to admitted sexual intercourse between her and the defendant—our supreme court deemed the defendant's rape conviction to have been not strongly supported by the record because the alleged victim's testimony was "the only direct evidence of the defendant's guilt" and "[t]here was no independent physical evidence that supported or contradicted [the alleged victim's] testimony." 2012 UT 32, ¶¶ 3, 30.

¶43    In contrast, although Kylee's testimony was the only direct evidence of her lack of consent due to intoxication and resulting unconsciousness, that testimony was independently corroborated by, among other things, Vargas's own admissions to Detective about drinking with Kylee for several hours at multiple bars; the surveillance video showing her significant impairment just before entering the hotel room; and the video Vargas took without Kylee's permission of her walking naked in the room, suggesting his readiness to breach sexual boundaries when she was unaware. For these reasons, we disagree with Vargas's view that his conviction was not strongly supported by the record.

¶44    Additionally, even as to cases where the prosecution's case is not strongly supported, we do not read *Salazar* or *Gregg* as announcing a per se rule requiring defense counsel to seek admission of any evidence with the potential to undermine an

alleged victim's credibility despite the fact that the evidence might also undermine the defendant's case. In both *Salazar* and *Gregg*, the evidence that defense counsel failed to introduce, resulting in their performance being deemed deficient, had no apparent potential to harm the defendants' cases. *See Salazar*, 2022 UT App 38, ¶¶ 22, 47, 50–53; *Gregg*, 2012 UT 32, ¶¶ 25, 27. Indeed, in *Salazar*, we essentially said as much. *See* 2022 UT App 38, ¶¶ 47, 52 (explaining that the evidence defense counsel failed to introduce would not have opened the door to the State calling a rape-myth expert in rebuttal). Moreover, in *Salazar*, we cited with approval *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350, for the proposition that "when analyzing whether trial counsel's performance was unreasonable courts must consider *all the circumstances*." 2022 UT App 38, ¶ 45 (emphasis added) (cleaned up). Thus, whatever principles may be gleaned from *Salazar* and *Gregg*, they do not include a brightline rule requiring defense counsel to seek admission of all evidence with the potential to undermine an alleged victim's credibility in cases where the prosecution's case is not strongly supported, even if the evidence might also undermine the defendant's case.

¶45 For all of the foregoing reasons, we conclude that Counsel did not perform deficiently by failing to insist on admitting an unaltered version of the video Vargas took of Kylee naked in the hotel room. And because Counsel did not perform deficiently, Vargas's first ineffective assistance claim fails.[4]

---

4. Vargas filed a motion under rule 23B of the Utah Rules of Appellate Procedure requesting a remand to supplement the record with the unaltered version of the video. Other than Kylee's unblurred nakedness, which we have already addressed, the only thing the unaltered version of the video would apparently show is that Vargas was masturbating while filming Kylee—something that is also discreetly blurred in the version of the video shown to

(continued…)

B.     Kylee's Text Message to Vargas

¶46     Vargas also claims that Counsel rendered ineffective assistance by not objecting, on hearsay grounds, to the admission of the text message Kylee sent to Vargas after the assault that said, "[Y]ou totally took advantage the other night and I'm not ok with it." This ineffective assistance claim fails because, even if Counsel performed deficiently by not objecting, Vargas has not persuaded us that Counsel's assertedly deficient performance prejudiced his defense.

¶47     To establish prejudice, Vargas "must show that there is a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Meik*, 2024 UT App 46, ¶ 33, 547 P.3d 878 (cleaned up), *cert. denied*, 554 P.3d 923 (Utah 2024). "A reasonable probability is a

---

the jury. Vargas argues that Kylee's willingness to walk naked in front of him while he was masturbating, thereby "indicating a desire to have continued sexual relations with her," makes it "even less likely that she would have turned her back on him [to get dressed] if she was actually fearful of him." Even if that interpretation is a valid view of those facts (a question on which we express no opinion), Counsel could have reasonably concluded that under another valid view, showing the jury that Vargas was masturbating while he filmed Kylee might have only further inflamed the jury against him. For one thing, it would have shown that he was not "just basically taking a video of the room," as he claimed. Further, it would have demonstrated that he was focused more on his own sexual gratification than on showing any concern for Kylee or her feelings. Accordingly, we conclude that the additional evidence proffered as part of Vargas's rule 23B motion could not support an ineffective assistance claim, and we therefore deny the motion.

probability sufficient to undermine confidence in the outcome." *Id.* (cleaned up).

¶48    Vargas bears the burden of persuasion on this issue. *See Utah Dep't of Transp. v. Coalt, Inc.*, 2020 UT 58, ¶ 45, 472 P.3d 942 ("An appellant bears the burden of persuasion on appeal."). Yet his principal brief contains no argument or analysis even attempting to demonstrate that there is a reasonable probability that the trial would have yielded a more favorable result for Vargas if the text message had not been admitted. And the argument on this point in Vargas's reply brief does not identify or address any part of the substantial body of evidence aside from the text message itself that supports the jury's verdict. *See generally Gregg v. State*, 2012 UT 32, ¶ 26, 279 P.3d 396 (explaining that analysis of the prejudice prong of an ineffective assistance claim requires consideration of "the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record" (cleaned up)). We therefore conclude that Vargas has failed to adequately brief this prong of his ineffective assistance claim and, thus, that he has not met his burden of persuasion. *See State v. Wright*, 2019 UT App 66, ¶ 46, 442 P.3d 1185 ("An appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." (cleaned up)). For this reason, Vargas's second ineffective assistance claim fails.[5]

---

5. We observe that Vargas does not contest the admission of the video of his interview with Detective, wherein Vargas can be seen and heard explaining that Kylee sent him a message a few days after the assault saying she was upset with him. Vargas can then be heard saying that he did not understand why she was upset with him because he believed that their intercourse had been consensual. Where Vargas does not challenge the admission of

(continued…)

## II. Sufficiency of the Evidence

¶49    Vargas also asserts that there was insufficient evidence to support his conviction because Kylee's testimony was inherently improbable under *State v. Robbins*, 2009 UT 23, 210 P.3d 288, and that the district court therefore erred by denying his motion to arrest judgment.[6] We disagree.

¶50    A district court "may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Bolson*, 2007 UT App 268, ¶ 10, 167 P.3d 539 (cleaned up). "When a sufficiency of the evidence challenge is based on the inherent improbability of certain evidence, our analysis proceeds in two parts." *State v. Hughes*, 2024 UT App 168, ¶ 28, 560 P.3d 188, *cert. denied*, 564 P.3d 957 (Utah 2025). Specifically,

---

this evidence, it is difficult to see how the separate admission of the actual message explaining that Kylee was upset "[b]ecause [he] totally took advantage [of her] the other night" prejudiced his defense. *See State v. Garcia*, 2024 UT App 38, ¶ 39, 546 P.3d 900 (noting our longstanding "disinclination to find prejudice when improperly admitted testimony is merely cumulative of other properly admitted evidence"), *cert. denied*, 550 P.3d 997 (Utah 2024).

6. The State contends that Vargas failed to preserve his sufficiency of the evidence claim. Because the merits of the claim can be easily resolved in favor of the State, we do not address its preservation. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (stating that "if the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation").

we first analyze the evidence that the defendant claims is inherently improbable and determine whether that evidence is of such poor quality that it should be disregarded. If we determine that the challenged evidence is inherently improbable, we then determine whether sufficient evidence remains under which a reasonable jury could have convicted. On the other hand, if we determine that the challenged evidence is not inherently improbable, our sufficiency-of-the-evidence analysis will include the challenged evidence.

*Id.* (cleaned up).

¶51    "It is difficult to successfully establish an inherent improbability claim on appeal," and "labeling a witness's testimony as inherently improbable should be reserved for rare cases." *Id.* ¶ 32 (cleaned up). "This is because appellate courts typically do not make credibility determinations, and typically resolve any arguments about conflicts in the evidence in favor of the jury verdict." *Id.* (cleaned up).

¶52    "When presented with an inherent improbability claim, we consider the situation as a whole, including the context in which the testimony was offered." *Id.* ¶ 33 (cleaned up). "Testimony will generally be disregarded only when no corroborating evidence exists." *Id.* (cleaned up). "The inherent improbability standard generally is not satisfied by the mere existence of a conflict in the evidence." *Id.* (cleaned up). "Nor is this standard satisfied where the appellant raises garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account[s] to believe." *Id.* (cleaned up).

¶53    "There are three hallmarks of inherently improbable testimony that courts have often considered in their analysis: material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Id.* ¶ 34 (cleaned up). "But while these

three hallmarks are beneficial, they are not controlling." *Id.* (cleaned up). "The ultimate question . . . is whether the testimony of the witness runs so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Id.* (cleaned up).

¶54 Vargas claims that Kylee's trial testimony bears all three hallmarks of inherent improbability. We, however, see no lack of corroboration, no patent falsehoods, and only the sort of inconsistencies that raise garden-variety credibility questions such as which among a witness's conflicting accounts to believe. We address each hallmark in turn.

A. Lack of Corroborating Evidence

¶55 Vargas admitted in his interview with Detective that he engaged in sexual intercourse with Kylee, thus corroborating her account that intercourse occurred. The key issue in this case was whether that intercourse was consensual. The jury was instructed that the intercourse was without Kylee's consent if she "expressed lack of consent through words or conduct" or if Vargas "knew [she] was unconscious, unaware that the act was occurring, or was physically unable to resist." Kylee testified that she was unconscious or otherwise unaware that the intercourse was occurring and that when she awoke, she stopped Vargas from continuing.

¶56 As already noted, *see supra* ¶ 43, Kylee's testimony regarding her lack of consent was corroborated by Vargas's own statements about drinking with her for several hours at multiple bars and the surveillance video showing her significant impairment just before she entered the hotel room. It was further corroborated by, among other things, the surveillance video of the two of them leaving the hotel room later in the morning, which shows Kylee pausing, looking both directions down the hallway, and saying something to Vargas while gesturing in both directions before he begins walking, suggesting that she was

sufficiently unaware when she entered the room that she did not know which way to go when she exited it.

¶57 Additionally, Vargas's knowledge of her unconsciousness was corroborated by the video evidence of him helping Kylee to the room. It was also corroborated by Vargas leaving the hotel room to retrieve his motorcycle only one minute after he and Kylee entered the room, conduct he would have known—but for her immediately falling asleep or passing out—might very well have alerted Kylee to the fact that his insistence on getting a room because he was too drunk to drive was merely a pretext. And the notion that Vargas would proceed with intercourse in the face of Kylee's unconsciousness was corroborated by Bartender's testimony of Vargas announcing—without Kylee's knowledge and before Vargas and Kylee had broached the topic—that the two of them had a room across the street, as well as by Vargas's recording a video without Kylee's permission of her walking naked in the room, both of which suggest Vargas's willingness to ignore or make assumptions about Kylee's consent to particular conduct.

¶58 Given the foregoing, Vargas's assertion of a lack of evidence corroborating Kylee's testimony is plainly incorrect.

B.    Patent Falsehoods

¶59 Vargas asserts that Kylee's testimony "that she was scared of Vargas because he tried to pull her back into bed" was patently false. In support of this assertion, he points to the evidence of Kylee walking naked in front of him without making an effort to hide, her kissing him before getting on his motorcycle, and her failing to seek help or report the rape when he returned to the hotel room to look for his shirt. The first problem with Vargas's argument is that it is unclear whether Kylee even testified that she was scared of Vargas because he tried to pull her back into bed. After obtaining Kylee's acknowledgement that she told Officer that after she awoke she "wanted to punch [Vargas] in the face,"

Counsel asked, "You were scared, you were mad?" Kylee replied, "Yeah, because he kept trying to pull me back into bed." That reply did not clarify whether she was scared, mad, or both. And because that lack of clarification left ambiguity as to whether Kylee even asserted that she was scared, we cannot say that this testimony was patently false.

¶60 Moreover, "this court's prior caselaw has reiterated that rape victims display a diverse range of reactions to the harm they suffered." *State v. Nunes*, 2020 UT App 145, ¶ 30 n.12, 476 P.3d 172 (cleaned up). "Despite the persistence of certain cultural myths, not all rape victims will immediately report the attack or have no further interaction with their rapists." *Id.* (cleaned up); *see also* Martha R. Burt, *Cultural Myths and Supports for Rape*, 38 J. Personality & Soc. Psych. 217, 217 (1980) (defining "rape myths" as "prejudicial, stereotyped, or false beliefs about rape, rape victims, and rapists"). Thus, even if Kylee did testify that she was scared of Vargas, the assertion that such testimony was patently false in light of her actions identified above is a mere perpetuation of cultural myth, and we firmly reject it.

C.    Material Inconsistencies

¶61 Finally, Vargas asserts that Kylee's testimony was materially inconsistent in the following ways:

- her testimony "that she was so drunk that she had to be carried is entirely at odds with the hotel surveillance video that shows her walking the entire way under her own power";

- her testimony "that she was woozy is inconsistent with her statement to [Nurse] that she actually blacked out" and with her acknowledgement that she was "sober enough to light a cigarette" when Vargas went into the hotel to get a room;

- her testimony "that Vargas guided her through the hotel is plainly at odds with her testimony that she took his hand after he let go of her hand as well as with the video that shows her voluntarily holding his hand";

- her testimony "that she awoke lying on her side" is at odds with her statement to Nurse "that Vargas was on top of her having intercourse with her"; and

- her testimony that she awoke to Vargas having intercourse with her is "inconsistent with [her] statement to [Coworker] that she asked Vargas whether the two had actually had sex."[7]

These purported material inconsistencies do not render Kylee's testimony inherently improbable.

¶62 For starters, we observe again that "testimony will generally be disregarded only when no corroborating evidence exists." *State v. Hughes*, 2024 UT App 168, ¶ 33, 560 P.3d 188 (cleaned up), *cert. denied*, 564 P.3d 957 (Utah 2025). Thus, although Vargas may have identified some inconsistencies in Kylee's testimony, the fact that the most salient parts of her testimony are corroborated by other evidence prevents a conclusion that her testimony as a whole was inherently improbable.

¶63 Additionally, some of the purported inconsistencies Vargas identifies are not actual inconsistencies when all of Kylee's testimony is viewed together. For example, although she admitted telling Nurse that Vargas "carried [her]" to the hotel room, she later explained that her "version[]" of "carry" was

---

7. In his list of purported material inconsistencies, Vargas also includes the testimony, addressed above, that he claims was patently false. For the same reasons that we concluded that testimony was not patently false, we also conclude it was not materially inconsistent.

"different than everybody else's" and that what she really meant was that he "help[ed]" or "assist[ed]" her, not that he "physically carr[ied]" her. Likewise, her testimony that she was "woozy" was not inconsistent with her testimony that she "blacked out" because she explained that prior to arriving at the hotel room she "[j]ust felt really woozy" but that she blacked out "[a]t the hotel" after "[falling] onto the bed."

¶64    Finally, even the portions of Kylee's testimony that were inconsistent (such as her apparently conflicting assertions as to whether Vargas was behind her or on top of her when she woke up) raise only "garden-variety credibility questions"—namely, as to which version of her conflicting accounts should be believed—and, hence, they do not render her testimony inherently improbable. *Id.* (cleaned up).

¶65    In sum, because Kylee's testimony does not lack corroboration, contains no patent falsehoods, and includes only the sort of inconsistencies that raise garden-variety credibility questions, it was not inherently improbable. And because Vargas does not contend that the evidence when it includes Kylee's testimony was insufficient to support his conviction, the district court did not err in denying his motion to arrest judgment.

CONCLUSION

¶66    We conclude that Vargas's two claims of ineffective assistance of counsel fail because, as to the first, he has not shown that Counsel performed deficiently and, as to the second, he has not shown that Counsel's assertedly deficient performance prejudiced his defense. Vargas has failed to meet his burden under rule 23B of the Utah Rules of Appellate Procedure, and we therefore deny his motion for remand under that rule. And because we determine that Kylee's testimony was not inherently improbable, we conclude that the district court was correct in

denying Vargas's motion to arrest judgment. Having rejected each of Vargas's claims on appeal, we affirm his conviction.

———————

TENNEY, Judge (concurring, in which Judges Luthy and Oliver joined):

¶67　In the early days of the internet, attorney Mike Godwin made an observation that has since been coined as "Godwin's law." It posits that as "a discussion on the Internet grows longer, the likelihood of a person's being compared to Hitler or another Nazi increases."[8] Godwin's law is not meant to be aspirational. If anything, I understand it to be suggesting that such comparisons are usually (though perhaps not always) a sign of weakness.

¶68　As discussed above, Vargas's first argument on appeal is that his trial counsel should have asked the court to let him play an unpixellated version of a video that Vargas surreptitiously took of Kylee walking naked across the hotel room as she picked up her clothes. In his opening brief, Vargas's appellate counsel analogized the jury's purported need to see that video to the "horror one feels at seeing raw video footage of starving Jews in Nazi concentration camps." (As explained in the lead opinion, his point was that a person can only truly understand a thing by seeing it, as opposed to hearing about it.) After the State suggested in its responsive brief that this analogy was "patently offensive," appellate counsel didn't ignore the matter or back down in his reply brief. Instead, he defended the analogy and then repeated it in even more descriptive and graphic form.

———

8. *Godwin's law*, Wikipedia, https://simple.wikipedia.org/wiki/Godwin%27s_law [https://perma.cc/8RNW-D5LN].

¶69    I share the State's view that this analogy was inappropriate in this case. And I note that both this court and other courts have cautioned attorneys to avoid making analogies or comparisons to Hitler, Nazis, or the Holocaust unless truly warranted. *See State v. Florreich*, 2024 UT App 9, ¶ 98 n.13, 543 P.3d 795 ("A decision to use Hitler as a reference point is one that is fraught with peril and should be avoided in most any case."), *cert. denied*, 547 P.3d 828 (Utah 2024); *Peavler v. Denney*, No. 05CV654, 2008 WL 4378435, at *13 (E.D. Mo. Sept. 23, 2008) (suggesting that a prosecutor's arguments about Hitler and the Holocaust in an effort to describe accomplice liability were "undoubtedly overzealous and probably objectionable"); *Owens-Corning Fiberglas Corp. v. Garrett*, 682 A.2d 1143, 1152 (Md. App. Ct. 1996) ("admonish[ing] plaintiffs' counsel for their repeated references to murder and analogies to 'Nazis' and the 'Holocaust,'" observing that "[s]uch terms are unduly inflammatory" and "raise certain images and specters which could be extremely upsetting and unfairly influential to jurors who may have personal experience with the persons and events behind the terms so carelessly tossed about in the courtroom"); *Petro v. Platkin*, 277 A.3d 480, 501 (N.J. Super. Ct. App. Div. 2022) ("reject[ing]" a party's "reference and analogy to the inhumane acts of Hitler and Nazi Germany as improper and insensitive"); *State v. Kaprosch*, No. A-3216-17T4, 2020 WL 1081571, at *7 (N.J. Super. Ct. App. Div. Mar. 6, 2020) (stating "the comments regarding Adolf Hitler by defense counsel and the prosecutor were entirely inappropriate and had no place in this trial"); *State v. Schierman*, 438 P.3d 1063, 1136 (Wash. 2018) (noting that "courts overwhelmingly disapprove of a prosecutor's Holocaust analogy in closing argument").

¶70    For whatever it's worth, I also thought the analogy in this case was both distracting and unnecessary. "A picture is worth a thousand words" is an easy enough concept to understand. And while analogies are often an effective tool in legal writing, there were any number of available options that didn't involve graphic descriptions of mass murder. From my vantage point, it would

seem to be the rarest of cases that would support the use of the Holocaust or Nazis as an appropriate rhetorical reference point for an analogy or a comparison. Attorneys who venture into such territory anyway should know that they are running a real risk of undermining the credibility of their own case with the intended audience.

¶71    Whether it be for reasons of restraint, respect, or just outright strategy, I'd suggest that arguments such as this one should almost always be avoided.

———————